UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/12/2023
```

-----------------------------------------------------------------------X
                         :

MIGUEL TORRES,                  :
                       :

            Plaintiff,     :
                       :          20-cv-10782 (LJL)
                       :

        -v-                 :        OPINION AND ORDER
                       :

METRO-NORTH RAILROAD CO.,   :
                       :

           Defendant.    :
                       :
-----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

    Defendant Metro-North Railroad Company ("Defendant" or "Metro-North") moves, pursuant to Federal Rule of Civil Procedure 59, for a new trial on the grounds that the jury's damages verdict was excessive, or, in the alternative, for remittitur of the jury's award for lost earnings and past and future pain and suffering.  Dkt. No. 74.  Plaintiff Miguel Torres ("Plaintiff" or "Torres") opposes the motion for a new trial or remittitur of damages for pain and suffering but does not dispute that the jury's award of past lost wages of $250,000 should be remitted at least in part.  Dkt. No. 77 at 1.

    For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

    Familiarity with the prior proceedings in this matter is assumed.

    Torres initiated this action on December 21, 2020, alleging that Defendant was liable under the Federal Employers Liability Act ("FELA"), 45 U.S.C. §§ 51 *et seq*., for injuries he suffered on March 24, 2018 while working on a Metro-North truck.  Dkt. No. 1.  In short, on March 24, 2018, while Plaintiff was working as a structural welder/ironworker at Defendant's location at the Park Avenue Viaduct, the steel frame walkway fell off of the bed of a boom truck

operated by Defendant and struck Plaintiff in the base of the neck, rendering him unconscious. *Id.* ¶¶ 8–9; Trial Transcript ("Tr.") 27–29, 37; Pl. Ex. 2. Plaintiff alleged that the accident caused him to suffer a concussion, post-concussion syndrome, a minor brain injury, and herniated discs in his neck, which resulted in chronic neck pain and permanent limitations to the range of motion of his neck. Dkt. No. 54 at 2. Plaintiff sought lost wages and damages for past and future pain and suffering. *Id.*

The jury trial in the case began on March 20, 2023, and concluded on March 22, 2023. Pursuant to a stipulation of liability dated February 17, 2022, Defendant admitted responsibility for the accident. Dkt. No. 36-1. According to the stipulation, which was read to the jury, Defendant agreed "not [to] contest liability for the happening of the subject accident that occurred on March 24, 2018, in East Harlem, New York, which forms the basis of this action." *Id.* Thus, the primary issue for the jury was damages.

Four witnesses testified at trial: Randolph Pareja, a Metro-North manager involved in the investigation of the accident; Joe Salvate, a machinist who was a co-worker of Plaintiff from Metro-North; Dr. Arien Smith, whose remote deposition testimony was played for the jury; and Plaintiff. In addition, the Court received, without objection, the report of Defendant's expert, Dr. Jeffrey Passick, Pl. Ex. 22, and the statement of Plaintiff's co-worker, Kitson Tate, Pl. Ex. 5.

The evidence at trial demonstrated the following: After the beam struck Plaintiff, Plaintiff was trapped under the beam, breathing but unresponsive. Tr. 37; *see also id.* 41, 43, 80; Pl. Ex. 5. Plaintiff testified that when he first regained consciousness, he was on the ground facing up with the structure he was there to install on top of him and was experiencing a lot of pain in his neck, back, and spinal cord. Tr. 87. He testified that he lost consciousness again and awoke in the emergency recovery room of the hospital. *Id.* At the hospital after the accident,

Plaintiff complained of head, neck, upper back, and left shoulder/arm pain.  Pl. Ex. 7.  Metro-North's Occupational Health Services ("MN OHS") deemed Plaintiff unable to work on March 24, 2018.  *See* Pl. Exs. 19, 20.  Plaintiff did not return to work until late September 2018. Tr. 92.

Over the next twenty-one months, until January 2020, Plaintiff continued to receive medical treatment at MN OHS, Mount Sinai, and various other doctors' and physical therapists' offices.  *Id.* at 89–97, 103; *see* Pl. Exs. 11, 13, 17, 21.  At a follow-up appointment with an internist on March 27, 2018, Plaintiff's chief complaint was of "sharp pain from his head to length of his spine" and he stated that Aleve was not strong enough to address his pain.  Pl. Ex. 8.  On April 4, 2018, during another follow-up visit shortly after the accident, Plaintiff complained of continued diffuse, constant headaches, new short-term memory problems, pain when moving and bending, and dizziness.  Pl. Ex. 10.  At that appointment, Plaintiff described his pain as a constant seven on a scale of one-to-ten, though he indicated that rest and medication relieved his pain somewhat.  *Id.*  The doctor referred Plaintiff to rehabilitation and physical therapy.  *Id.*  That same day, Plaintiff was examined by MN OHS.  He complained of constant headaches, accompanied by dizziness with pain at a severity level of seven on a scale from one-to-ten.  Pl. Ex. 21.  His range of motion in the cervical spine was limited by pain, his range of motion with flexion and extension was severely restricted, and his spinal processes were tender to palpitation.  *Id.*

On April 4, 2018, Plaintiff completed and signed a Metro-North Railroad Report of Medication Examination.  D. Ex. A-1.  The following questions were among those that Plaintiff responded to affirmatively:

6.    Any physical or mental condition which may restrict your ability to work?
      Yes.

. . .

9.        Fainting or dizziness?  Yes.

. . .

16.     Back issues, lumbago or sciatica?  Back issues: Yes.
17.     Trouble with hips and knees?  Left: Yes.
18.     Trouble with shoulder, elbow, wrist or hand?  Left: Yes.
19.     Stiff, swollen or painful joints or muscles?  Yes.

. . .

23.     Excessive worry, depression or difficulty sleeping?  Yes.
26.     Loss of memory or difficulty concentrating?  Yes.

*Id.*

On April 9, 2018, Plaintiff had an initial visit with Mount Sinai's Interventional Spine and Sports Medicine Division of Rehabilitation Medicine for his neck pain.  Pl. Ex. 13.  On April 10 and 18, 2018, Plaintiff reported the same concerns to MN OHS that he had reported at prior visits.  Pl. Ex. 21.  On April 11, 2018, a neurologist at Doctors United, Dr. Sarasavani Jayaram, diagnosed Plaintiff with acute closed head trauma with post traumatic headache, dizziness/vertigo, and post-concussion syndrome.  Pl. Ex. 17.  At trial, Plaintiff's expert, Dr. Arien Smith, testified that post-concussion syndrome constitutes "myriad of symptoms that occur after a mild traumatic brain injury" including headache, dizziness, nausea, vomiting, cognitive deficits, and cognitive difficulties such as memory loss or speech abnormalities.  Pl. Ex. 30 at 29–30.  At the April 11, 2018 visit, Dr. Jayaram also concluded that Plaintiff was "100% disabled from cognitive issues and vertigo due to casually related post-conscious syndrome and hence unable to [return to work]."  Pl. Ex. 17.  At a follow-up visit on April 23, 2018, Dr. Jayaram reiterated that Plaintiff was "still 100% disabled" and "unable to [return to work]."  *Id.*  Notes from a follow-up appointment at MN OHS on May 2, 2018 state that Plaintiff continued to complain about constant headaches, accompanied by dizziness with pain at a

severity level of eight on a scale of one-to-ten, and difficulty remembering things.  Pl. Ex. 21.

Plaintiff also reported constant cervical pain.  *Id.*

After the accident, Plaintiff underwent physical therapy from April 2018 through August

2018, participating in approximately fifty or fifty-four sessions.  Tr. 89; Pl. Ex. 13.  Medical

notes indicate that Plaintiff stopped physical therapy because it worsened his neck pain.  Pl.

Ex. 13 at ECF p. 22.  Plaintiff received multiple other therapies that summer.  From April 2018

through at least June 2018, Plaintiff wore a Miami J and later a Soft C-Collar.  *Id.*  In June 2018,

Plaintiff had an epidural injection in his spinal cord to alleviate his pain.  Pl. Ex. 15; Tr. 90.  At

trial, Plaintiff's expert testified that epidural injection requires a three-to-four-millimeter-wide

needle that is pushed into the soft tissue around the spine, a process that can be very

uncomfortable if the patient is not sedated.  Pl. Ex. 30 at 35.  In the summer of 2018, Plaintiff

was prescribed an electrostimulation device to help alleviate pain which he continues to use

approximately twice a week until today.  Tr. 90–91.

Mount Sinai Hospital progress notes from August 8, 2018 remark that Plaintiff reported

that his pain was "overall better" and rated his pain as a four on a scale of one-to-ten.  Pl. Ex. 13.

At the time, Plaintiff was taking sixty milligrams of duloxetine daily.  *Id.*  At an August 23, 2018

MN OHS clinic visit, Plaintiff reported "gradual improvement."  Pl. Ex. 21.  On September 10,

2018, Plaintiff met with Dr. Parag Sheth, a neurosurgeon at Mt. Sinai, to get clearance to return

to work.  Pl. Ex. 13; Tr. 91.  Plaintiff testified that he told Dr. Sheth that he would talk with his

supervisor about returning to work on light-duty.  Tr. 92.  Dr. Sheth's notes from the September

10, 2018 state that Plaintiff felt that he could return to work as a welder full time and that

Plaintiff could "work with his supervisor should he need any accommodation."  Pl. Ex. 13.

To return to work, Plaintiff was required to be cleared by MN OHS.  Tr. 92.  On

September 25, 2018, Plaintiff completed and signed a Metro-North Railroad Report of

Medication Examination.  D. Ex. A-2.  Plaintiff checked "yes" only to questions 1, 4, and 5 as

follows:

> 1. Have you been treated by your physician or practitioner?  Yes
>
> 4. Are you taking any medications?  Specify: blood pressure.  And chronic pain.
> Yes
>
> 5. Have you lost any time from work for medical reasons?  Yes

He left the answers to questions 6, 9, 16, 19, and 26, all of which were previously marked "yes,"

as blanks.  Tr. 92–93, 126; Pl. Ex. 21; D. Exs. A-1, A-2.  Physician comments from MN OHS

dated September 25, 2018 reflect that Plaintiff stated that his headaches had improved but were

not resolved, and during a physical exam, Plaintiff experienced neck pain upon rotation at the

end of his range of motion.  Pl. Ex. 21.  On September 26, 2018, Plaintiff was cleared to return to

work as a structural welder without restrictions by Dr. Sheth at MN OHS as Plaintiff continued

to report gradual improvement.  Tr. 92; Pl. Ex. 21.  Plaintiff returned to work shortly after being

cleared.  Tr. 93.

The job description for a structural welder working without restrictions specifies that the

employee "[m]ust be able to lift and carry tools and material weighing up to 50 lbs on a regular

basis and occasionally up to 75 lbs."  D. Ex. B.  Upon returning to work, Plaintiff asked his

supervisor, Lamont Dobson, to assign Plaintiff to light-duty work.  Tr. 93.  To address his

reduced physical capacity, Dobson put Plaintiff to work in the supply room.  *Id.* at 93–94.  Since

returning to work, Plaintiff has continued to work in the supply room.  *Id.* at 94.  He also drives a

truck, works as a forklift operator, does ironworker duties, cuts steel, drills steel plates, does

occasional welding, works as a flagman, and does pointing of bricks.  *Id.* at 97–100, 110.  When

6

Plaintiff returned to work in September 2018, he was considered able to perform all of the functions of a structural welder including walking, balancing, and climbing.  *Id.* at 125; D. Ex. B.

Physician notes from October 2018 to May 2019, after Plaintiff returned to work, reflect that Plaintiff continued to have intermittent neck pain with a restricted range of motion, that was worsened by quick neck movements or overhead work.  Pl. Exs. 21, 25.  About a month and a half after returning to work, on November 3, 2018, Plaintiff had a follow-up appointment at Mount Sinai Hospital, during which he complained of discomfort in his neck and shoulders.  Pl. Ex. 18.  At that appointment, Plaintiff reported he felt like working in the morning but "r[an] out of gas by 12 oclock [sic] and by 3 oclock [sic] [he was] having a lot of pain."  *Id.*  On February 14, 2019, at a follow-up visit at Mount Sinai Hospital, Plaintiff described increased neck pain that worsened with movement and reported that these injuries made him unable to perform his jobs.  Pl. Ex. 13.  Three months later, at another follow-up visit at Mount Sinai on May 20, 2019, Plaintiff reported continued neck pain which he rated an eight on a scale of one-to-ten.  *Id.*

Throughout the fall of 2018, Plaintiff took Cymbalta, which initially improved his pain. Tr. 94.  After Cymbalta ceased to be effective in February 2019, Pl. Ex. 13, Plaintiff was prescribed gabapentin for his chronic pain, which he took, along with Aleve, from the fall of 2018 through the fall of 2019, Tr. 95.  When that medication failed to address his pain, Plaintiff was given a course of six injections in the neck from the beginning of 2019 through early 2020, which gave him from three weeks to three months of relief after each injection.  *Id.* at 96–97.  He continues to take Aleve for his pain, in the morning and at night.  *Id.* at 97.

At trial, Plaintiff testified that he estimates that about ninety percent of his work on the job is non-welder work.  *Id.* at 101.  Since Plaintiff's return to work, he has been earning substantial overtime.  *Id.* at 113.  In 2022, he earned roughly 1,800 hours of overtime and earned

about $220,000.  *Id.* at 113, 135.  Based on those figures, he was working fifteen hours a day.  *Id.*
at 136.  Because there were days when Plaintiff worked no overtime, Plaintiff would work
twelve hours of overtime on some days.  *Id.* at 137.

      At trial, Plaintiff offered the videotaped deposition of his expert, Dr. Arien Smith,
regarding Plaintiff's medical history and his assessment of Plaintiff's condition based on an
exam of Plaintiff that Dr. Smith conducted on July 9, 2021.  *See id.* at 45; Pl. Ex. 30.  Dr. Smith
opined that, as a result of the accident, Plaintiff ultimately suffered symptomatic injuries to his
neck, symptomatic cervical stenosis from disc herniations, and a concussion, including post-
concussion syndrome with headaches, dizziness, and some cognitive issues.  Pl. Ex. 30 at 64–65.
At Dr. Smith's evaluation of Plaintiff on July 9, 2021, Plaintiff's chief complaint was of neck
pain, cervical spine pain, low back pain, associated hand weakness and numbness, difficulty
performing his activities of daily living, and some occasional dizziness and memory problems.
Pl. Ex. 30 at 12–13.  At the exam, Dr. Smith examined Plaintiff for muscle spasms and felt
spasms in Plaintiff's neck and lower back.  *Id.* at 15.  Dr. Smith also measured Plaintiff's range
of motion in his neck, using a goniometer.  *Id.* at 15–16.  Plaintiff's flexion value, the
measurement of how far the head can move downward to the chest, was thirty-two degrees,
about one third of the typical flexion for a healthy person.  *Id.* at 16–17.  Plaintiff's extension
value, the measurement of how far the chin can extend toward the ceiling, was 21.5 degrees, also
about one-third the typical extension for a healthy person.  *Id.*  Dr. Smith also performed a
strength exam because the spinal nerves control strength and proception.  *Id.* at 17–18.
Dr. Smith testified that Plaintiff was "weak in all of the major muscles" typically tested for
strength.  *Id.* at 18.  Dr. Smith also measured Plaintiff's hand grip strength using a dynamometer
machine.  *Id.* at 19.  Dr. Smith found both Plaintiff's right and left hand grips were "significantly

weak"—"one-third . . . lower limit of normal." *Id.* at 19–20.  Plaintiff's right grip force was 10.5 kilograms and his left hand grip force was 11.2 kilograms.  *Id.*  The normal range for an individual in the same age group is 30.7 and 48.5 kilograms.  *Id.*  Based on his review of Plaintiff's medical records, Dr. Smith testified that Plaintiff underwent "what is pretty standardly known as conservative pain management." *Id.* at 52–53.

Dr. Smith also testified to his review of a May 13, 2021 magnetic resonance imaging ("MRI") of Plaintiff's cervical spine.  *Id.* at 53; *see also* Pl. Ex. 27.  Plaintiff also had MRIs of his cervical spine on May 30, 2018 and September 9, 2019.  Pl. Ex. 13.  Dr. Smith testified that, "in comparison to an earlier film," Plaintiff had "multiple . . . cervical disc herniations at three different levels."  Pl. Ex. 30 at 53.  Plaintiff had been diagnosed with degenerative disc disease prior to the accident although he was asymptomatic, *id.* at 14, 99, which Dr. Smith stated was normal for his age, *id.* at 98, 100.  Dr. Smith explained that someone with degenerative disc disease is more susceptible to injury from trauma depending on the degree of the disease.  *Id.* at 117.

Dr. Smith ultimately opined that Plaintiff had exhausted all modalities of conservative management with respect to his neck and that his condition was unlikely to improve.  *Id.* at 63.  Dr. Smith testified that Plaintiff's neck injuries and concussions were a "direct result of the workplace accident." *Id.* at 64–65.  Because the herniated discs and post-concussion syndrome were the results of the neck injuries and concussions, Dr. Smith attributed those conditions to the accident as well. *Id.*

Dr. Smith further concluded that Plaintiff's disc herniations, neck pain, and limited range of neck motion were "permanent."  *Id.* at 67–68.  The post-concussion syndrome was "most

likely permanent." *Id.* at 67.  Dr. Smith also opined that Plaintiff "can't perform his job as well as he used to" due to the weakness in his hands as a direct result of the accident.  *Id.* at 69.

Plaintiff also introduced the report of Dr. Jeffrey Passick, defense's medical expert, into testimony.  Tr. 76; Pl. Ex. 22.  Like Dr. Smith, Dr. Passick assessed Plaintiff's range of motion using a goniometer.  Tr. 78; Pl. Ex. 22.  Dr. Passick found Plaintiff's flexion and extension were both thirty-five degrees.  Pl. Ex. 22.  Flexion is typically fifty degrees and extension is typically sixty degrees.  *Id.*  Dr. Passick also measured Plaintiff's right rotation, left rotation, and left and right lateral flexion.  Plaintiff's measurements were forty-five, forty-five, thirty, and thirty degrees.  *Id.*  The normal value for left and right rotation is eighty degrees.  *Id.*  Normal left and right lateral flexion is forty-five degrees.  *Id.*  Dr. Passick diagnosed Plaintiff with a cervical spine strain, noted exacerbation of degenerative disc disease, and found Plaintiff was recovered with permanent residuals to the cervical spine.  *Id.*

At trial, Plaintiff testified to the long-term effects of the accident on his life.  Plaintiff told the jury: "since the accident, I'm not the same, so I move my body differently.  My neck, I can go so far each way, so I compensate . . . with my body."  Tr. 101.  He testified that what bothers him most about his injuries is his ongoing pain and the frustration he experiences "knowing that you're not going to get any better that it's for the rest of my life."  *Id.* at 109.  He also testified that since the accident there has been no length of time when he has been entirely free of pain or discomfort and that he feels pain in his neck that is "not stopping" and that fluctuates.  *Id.* at 105.  Plaintiff further stated that he derives less enjoyment from his job, stating "I used to enjoy my job when I was normal.  Now I'm limited and I try to enjoy my job as much as I can."  *Id.* at 153.  Before the accident, he would go to dancing school three times a week for two to three hour sessions.  *Id.* at 106.  He has not been able to dance since the accident because of the pain he

experiences. *Id.* at 106–07. Before the accident, he would go bicycling two to three times a week. *Id.* at 107. Since the accident, he has not bicycled outdoors because it is too dangerous and too painful. *Id.* at 108. Plaintiff also testified that his coworkers make fun of him for how he moves his neck and it is "annoying, humiliating," and embarrassing. *Id.* at 100–01.

On March 22, 2023,[1] the jury returned a plaintiff verdict, finding that Plaintiff proved, by a preponderance of the evidence, that the steel structure striking Plaintiff played a part in bringing injuries to Plaintiff. Dkt. No. 65 at 1. The jury awarded Plaintiff $250,000 for past lost wages and benefits; $1,000,000 for past pain, suffering, mental anguish, and loss of enjoyment of life's activities; and $5,000,000 for future pain, suffering, mental anguish, and loss of enjoyment of life's activities, for a total award of $6,250,000. *Id.* at 2.

## PROCEDURAL HISTORY

On April 13, 2023, pursuant to Federal Rule of Procedure 59, Defendant moved for a new trial on damages, or in the alternative, remittitur of damages, alleging the jury's damages verdict was excessive and shocked the conscience. Dkt. No. 74. On May 11, 2023, Plaintiff opposed Defendant's motion for a new trial and remittitur for the jury's award of past and future pain and suffering, arguing that the jury's award did not exceed the upper limit for jury awards in similar cases. Dkt. No. 77 at 1. Plaintiff agreed that the lost wages amount should be reduced, but only to $163,926. *Id.* at 1, 17. Defendant filed a reply brief on May 17, 2023. Dkt. No. 78.

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(a) of the Federal Rules of Civil Procedure provides: "The Court may . . . grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court."

---

[1] The jury verdict is mistakenly dated March 21, 2023. Dkt. No. 65.

Fed. R. Civ. P. 59(a).  Although "[i]t is well settled that calculation of damages is the province of the jury," *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir. 1990), "[u]nder Rule 59(a) the court may overturn an excessive award," *Leo v. Long Island R. Co.*, 307 F.R.D. 314, 321 (S.D.N.Y. 2015).

"[W]here there is no particular discernable error" in the jury's award, the Second Circuit has generally "held that a jury's damage award may not be set aside as excessive unless 'the award is so high as to shock the judicial conscience and constitute a denial of justice.'" *Genovese v. Cnty. of Suffolk*, 128 F. Supp. 3d 661, 674 (E.D.N.Y. 2015) (quoting *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998)).  "Where the court has identified a specific error, however, the court may set aside the resulting award even if its amount does not 'shock the conscience.'"  *Kirsch*, 148 F.3d at 165.

With respect to a damages award for pain and suffering, "[t]o determine whether an award is so high as to 'shock the judicial conscience,' the Court must consider the amounts awarded in other, comparable cases."  *Webber v. Dash*, 607 F. Supp. 3d 407, 414 (S.D.N.Y. 2022) (quoting *Mathie v. Fries*, 121 F.3d 808, 813 (2d Cir. 1997)); *see Mathie*, 121 F.3d at 813; *Small v. City of New York*, 2022 WL 1261739, at *13 (S.D.N.Y. Apr. 28, 2022).  The court's task, however, is not to "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater."  *Sinkov v. Americor, Inc.*, 419 F. App'x 86, 93 (2d Cir. 2011) (quoting *Ismail*, 899 F.2d at 187).  Instead, because the nature of calculating damages for pain and suffering is inherently fact specific and imprecise, "the jury's award should not be disturbed unless 'the quantum of damages found by a jury is clearly outside the maximum limit of a reasonable range.'"  *Ragusa v. City of New York*, 222 F. Supp. 3d 297, 301 (S.D.N.Y. 2016) (quoting *Guzman v. Jay*, 303 F.R.D. 186, 197 (S.D.N.Y. 2014)).  Accordingly, the court's task is only to inquire whether the "verdict is within reasonable range."

*Sinkov*, 419 F. App'x at 93 (quoting *Ismail*, 899 F.2d at 187). "A verdict shocks the judicial conscience 'only if it surpasses an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable persons may differ, but a question of law.'" *Guzman*, 303 F.R.D. at 197 (citation omitted). The court also must view the evidence pertaining to pain and suffering in the light most favorable to the plaintiff. *See Rosello v. Long Island Rail Rd. Co.*, 50 F. Supp. 3d 242, 250 (E.D.N.Y. 2014).

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or under, the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).

## DISCUSSION

Defendant moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a) or, in the alternative, remittitur, on the grounds that the jury's damages verdict was excessive. Dkt. No. 74-2 at 1. In its motion, Defendant argues that the Court should grant a new trial because the jury's "grossly excessive" award constitutes an "exceptional circumstance" upon which a new trial should be granted. Dkt. No. 74-2 at 2. Specifically, Defendant argues that the jury did not heed the Court's instructions, acted out of sympathy for the Plaintiff, and "decided to punish" the Defendant. *Id.* at 4–5. Plaintiff opposes the motion, arguing that the jury's award did not exceed the upper limits for jury awards in cases with similar injury, although he does not dispute that the jury's award of past lost wages should be remitted to $163,926. Dkt. No. 77 at 1.

## I.     The Jury's Award for Lost Wages and Benefits Was in Error

First, Defendant argues that the jury's award of $250,000 for lost earnings was excessive and demonstrated that the jury did not listen to the Court's instructions and acted out of

sympathy for the Plaintiff and to punish Defendant.  Dkt. No. 74-2 at 1, 5.  Defendant largely

points to the fact that Plaintiff's testified to lost wages of only $78,100.  *Id.*

   For its part, Plaintiff acknowledges that the lost wages award should be remitted

downward.  Dkt. No. 77 at 1.  However, Plaintiff argues that the lost wages award should only be

remitted to $163,926 based on the evidence entered at trial.  *Id.* at 17.  Relying on the overtime

hours and pay reported on Torres's 2020, 2021, and 2022 paystubs relative to his 2017 paystub

and Torres's testimony that he worked 400 fewer hours of overtime per year after the accident,

Plaintiff alleges the jury could have reasonably inferred that Torres lost 450 hours of overtime

work per year in the four years following the accident as a result of that accident.  *Id.*  On the

basis that the paystubs indicate an average overtime payrate of about $67 per hour, Plaintiff

contends the jury could have found Torres lost out on $30,150 in overtime per year, or $120,600

over four years.  *Id.*  Multiplying that $120,600 gross wage amount by the 29% tax rate Torres

testified to at trial, Tr. 105, Plaintiff reaches a $85,826 net overtime wage loss, Dkt. No. 77 at 17.

Adding this calculated net overtime wage loss to the requested $78,1000, Plaintiff reaches his

proffered $163,926 in lost wages.  *Id.* at 17–18.

   In its reply memorandum, Defendant argues that Plaintiff's claim for lost overtime after

he went back to work is speculative.  Dkt. No. 78 at 5.  Defendant supports this argument by

pointing to Plaintiff's testimony that overtime varied from year to year based on the projects

required and Plaintiff's testimony that the availability of overtime was the same whether Plaintiff

worked in the supply room or out in the field.  *Id.*  Based on this evidence, Defendant contends

that the proper award for economic damages is $78,100.  *Id.*

   The Court instructed the jury that Plaintiff could recover for "loss of earnings and

benefits up to the date of [the] verdict" in addition to past and future pain and suffering,

including "any earnings lost as a result of his injuries," but that any award made for "earnings and benefits lost to date *must not be the result of speculation*." Tr. 197, 199–200 (emphasis added). The Court explained that the award was to be "calculated based on (1) the period of time [the jury found] Mr. Torres was disabled from working by the injuries caused by the Metro-North Railroad Company's negligence, and (2) the amount [the jury found] Torres would have earned had he not been disabled." *Id.* at 200. On the verdict form, this category of damages was designated "Past lost wages and benefits." Dkt. No. 65 at 2.

The Court agrees with Defendant that, based on the evidence at trial, the jury could not have reached an economic damages award in excess of $78,100. In summation, Plaintiff's counsel merely requested the jury award Torres $78,100 for lost wages. Tr. 167. That figure was supported by evidence. On direct examination, Plaintiff testified that, for the six months he was out of work, he lost $78,100 in wages. *Id.* at 104–05. He calculated that figure by taking his gross earnings from 2017, dividing those earnings by 12, multiplying the resulting figure by six, and then reducing it according to his actual tax rate. *Id.*

While the jury's award is not constrained by Plaintiff's request for damages in its summation, *see Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 481 (S.D.N.Y. 2003) ("[W]e need not afford conclusive weight to the statement of plaintiff's counsel and we review the evidence to determine whether the jury's verdict is excessive."), there was no evidence of additional lost wages that Plaintiff suffered as a result of the incident beyond $78,100. Plaintiff testified that he has consistently been working approximately 400 or fewer hours of overtime after returning to work after the incident, Tr. 153,[2] and certain records support

---

[22] Initially, Plaintiff testified he was working 700 fewer hours overtime per year, but then clarified that he wasn't sure what the exact number was but knew it was not the same. Tr. 113–114. On redirect, Plaintiff was also unsure whether he worked more or fewer overtime hours in

that the hours of overtime he worked in 2020, 2021, and 2022 were less than the number of hours of overtime he worked in 2017, Dkt. No. 77-3 at 109; Dkt. Nos. 77-17–77-19.  However, there was no evidence that the reduced number of overtime hours Plaintiff earned after the accident was caused by the accident as opposed to, for example, a decreased number of projects on which overtime could be earned.  To the contrary, Plaintiff admitted on cross-examination that the availability of overtime hours depends on the jobs lined up for any particular year.  There might be a big project one year permitting an employee to earn substantial overtime and no such project the next, reducing the employee's opportunity to earn overtime.  Tr. 154.  Plaintiff also admitted that his ability to earn overtime was not a function of whether he was assigned to work in the supply room or out on the field.  *Id.* at 138.  He could just as easily have accrued overtime during the period he was consigned to the supply room as when he was able to work in the field.  And, the evidence plainly showed that even after returning to work, Plaintiff was able to earn substantial overtime.  The evidence did not establish with any certainty that Plaintiff lost additional overtime as a result of injuries he sustained due to the incident.

This case thus is distinguishable from *Marcoux*, 290 F. Supp. 2d 457, upon which Plaintiff relies for the proposition that the amount a jury can award for lost wages is not limited to the amount requested in summations.  Dkt. No. 77 at 18.  In *Marcoux*, the court declined to remit the jury's $125,000 award for lost wages to $86,600, the amount plaintiff's counsel requested at trial, because there was evidence at trial from which the jury could have found that plaintiff was forced to use 500 hours of paid accrued leave to cover her time off from work, thereby depriving her of an additional approximate $30,000 of value.  290 F. Supp. 2d at 481–82.

2015 and 2016 than in 2017, initially answering that he worked more hours, but then clarifying he did not remember.  *Id.* at 148.

The court accepted plaintiff's argument that the jury could have calculated the value of that paid leave using testimony about plaintiff's annual salary to determine a weekly pay figure.  *Id.* at 481–82, 482 n.23.  In this case, by contrast, there is no figure for the overtime hours Plaintiff lost as a result of the injury because he did not testify that there were any projects on which he lost overtime and he admitted that the opportunity to earn overtime depended on the projects available and not on whether he was assigned to the supply room.  Accordingly, there is no "reasonable basis upon which to calculate the amount of damages" for lost overtime hours.  *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

The jury's $250,000 award for economic damages exceeds the $78,100 of loss supported by the evidence at trial.  The Court therefore concludes that the jury's award of economic damages was erroneous.

## II.     The Jury's Award for Non-Economic Damages Falls Outside a Reasonable Range and Shocks the Judicial Conscience

In addition to damages for lost earnings and benefits, Plaintiff sought damages "both for pain and suffering from the time of the incident to the present, and also for pain and suffering that [the jury found Plaintiff] is likely to endure in the future as a result of the incident."  Tr. 200.  The Court instructed the jury that damages for both past and future pain and suffering could include loss of enjoyment of life, which "involves the loss of the ability to perform daily tasks, to participate in the activities that were a part of the person's life before the injury, and to experience the pleasures of life."  *Id.* at 201.  The jury was further instructed that while there is "no exact standard for fixing compensation" for pain and suffering, such an award "must be fair and reasonable . . . [and] commensurate with the pain and discomfort actually endured by the plaintiff as a result of his injury."  *Id.* at 202.

Defendant argues that the jury's awards for non-economic damages, specifically the $1,000,000 award for past pain and suffering and the $5,000,000 award for future pain and suffering, are excessive and shock the conscience. Dkt. No. 74-2 at 1–4; Dkt. No. 74-1 at 1. Defendant asserts that "[t]he evidence concerning plaintiff's job, his physical abilities and his apparent ready acceptance of overtime when offered,[3] demonstrate that his claims of pain and suffering are greatly exaggerated . . . ."[4] Dkt. No. 74-2 at 5. Plaintiff, on the other hand, argues that numerous cases support a finding that the jury's award for past and future pain and suffering fall within the maximum limit of a reasonable range of damages. Dkt. No. 77 at 3.

The Court's review of an award of non-economic damages for excessiveness presents a distinct challenge. "[N]on-economic damages are always abstract—pain and suffering are difficult to quantify." *Munn v. Hotchkiss School*, 795 F.3d 324, 336 (2d Cir. 2015). "Translating human suffering into dollars and cents involves no mathematical formula," *McDougald v. Garber*, 536 N.E.2d 372, 376 (N.Y. 1989), and "[m]easuring pain and suffering in dollars is inescapably subjective," *Gibbs v. United States*, 599 F.2d 36, 39 (2d Cir. 1979); *see Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640, 655 (E.D.N.Y. 1997), *aff'd in part sub nom. Madden v.*

---

[3] Defendant sought to introduce testimony that overtime was voluntary, but he failed to list an appropriate witness on the joint pretrial order and was thus unable to introduce such testimony at trial. Tr. 30–31.

[4] Defendant additionally argues that Plaintiff's testimony regarding being teased by co-workers does not amount to the "outrageous conduct" or "unconscionable abuse" required for emotional distress claims under FELA, and, therefore, must be disregarded to the extent the testimony influenced the jury's award for "past emotional distress." Dkt. No. 74-2 at 9. Defendant misconstrues the law in its argument by citing the standard for emotional distress claims. Plaintiff did not seek damages for emotional distress. Rather, Plaintiff sought damages for past pain and suffering. As the Court instructed the jury, pain and suffering includes "any mental suffering, *including emotional suffering*, or any resultant physical ailment caused by the wrongful act of the defendant." Tr. 200 (emphasis added). Further, it cannot be said whether, if at all, or to what extent Plaintiff's testimony on the teasing factored into the jury's award for past pain and suffering.

18

*Digital Equip. Corp.*, 152 F.3d 919 (2d Cir. 1998) ("Attempts to make the plaintiff whole through money damages are acts of legal fiction which cannot mask the ultimate powerlessness of money to replace what an individual has lost in suffering the unalterable consequences of an injury.").  Among other things, the jury is permitted to consider "[t]he length of time during which pain or other harm to the feelings has been or probably will be experienced and the intensity of the distress."  Restatement (Second) of Torts § 905 (1979).  "In determining this, all relevant circumstances are considered, including sex, age, condition in life and any other fact indicating the susceptibility of the injured person to this type of harm."  *Id.*  The jury may also consider "the loss of the enjoyment of life which compensates for 'the frustration and anguish caused by the inability to participate in activities that once brought pleasure.'"  *Furey v. United States*, 458 F. Supp. 2d 48, 56 (N.D.N.Y. 2006) (citation omitted).

At the same time, however, the Court retains authority to review jury awards of pain and suffering lest law surrender to passion and a jury "may not abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket," *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 684 (2d Cir. 1993) (quoting *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir. 1988)).  In doing so, while the Court must recognize that "[e]ach experience of human suffering is unique" and "[t]he reverberations from a tragic event are not necessarily more . . . quantifiable through an examination of other people's suffering," *Geressy*, 980 F. Supp. at 655, it is appropriate to make reference to other awards in similar cases to determine whether a particular award shocks the conscience, *see Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 673 (2d Cir. 2012).  As recently explained by the Second Circuit, while awards for intangibles such as pain and suffering are inherently speculative, "a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and

proportionate." *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014). Courts

in this District look both to the "injuries suffered and the severity of the adverse action" in

considering awards in comparable cases. *Dotson v. City of Syracuse*, 549 F. App'x 6, 8 (2d Cir.

2013). Once the range of permissible, comparable decisions has been identified, the Court then

must consider whether the plaintiff's award falls within that range. *See Zeno*, 702 F.3d at 673;

*Leo*, 307 F.R.D. at 341–42. It also is appropriate to take inflation into account in analyzing

historical cases. *See Turley*, 774 F.3d at 163.

Both Plaintiff and Defendant have submitted numerous cases in support of their

respective arguments on the excessiveness of the award. *See* Dkt. No. 74-2 at 5–10; Dkt. No. 77

at 4–7; Dkt. No. 78 at 4. The damages award in cases cited by Defendant range from $100,000

to $750,000. Dkt. No. 74-2 at 6–10. Adjusted for inflation, this range amounts to $134,000 to

approximately $1,388,000.[5] Dkt. No. 74-2 at 6–10; Dkt. No. 78 at 4. The damage awards in

cases cited by Plaintiff, adjusted for inflation by Plaintiff's expert, range from approximately

$1.9 million to approximately $4 million. Dkt. No. 77-1 at 3.

The cases cited by Defendant more closely resemble the facts of this case than those cited

by Plaintiff. The Court accepts that Plaintiff will continue to suffer some pain for the rest of his

life, that his range of motion of his neck and back are permanently limited, and that, as a result,

he will suffer some restrictions on his ability to enjoy life as he previously did prior to the

accident. The Court credits Plaintiff's testimony that he can no longer participate in dancing

lessons as he used to several times a week before the accident and that he is afraid to bicycle

---

[5] The Court uses the U.S. Bureau of Labor Statistics CPI inflation calculator to adjust awards for inflation. Any values not adjusted for inflation by the parties have been adjusted by the Court using the CPI inflation calculator. *See* CPI Inflation Calculator, U.S. Bureau of Labor Statistics, https://www.bls.gov/data/inflation_calculator.htm.

outdoors.  At the same time, however, Plaintiff was not forced to undergo surgery and his pain is not debilitating:  he was able to return to work relatively soon after the accident, he has been able to earn extensive overtime since the accident, he did not testify to any pain or mental anguish that was excruciating, and he does not appear to have suffered any other injuries, including any emotional disorders.  He attended dancing school for only six years prior to 2012, Tr. 106, and the Court discounts Torres's testimony that he consistently attended dancing school three times a week for two to three hour sessions as inconsistent with his overtime hours.  Although Torres testified that he found it too painful and dangerous to bike outdoors after his accident, *id*. at 107-08, he testified to no other limitations on his life activities.  To the extent that there are descriptions in the cases cited by Plaintiff,[6] the injuries suffered by the plaintiffs in those cases were far more extensive than that suffered by Plaintiff and the pain and suffering experienced by those plaintiffs far greater than that experienced by Plaintiff here.  In *Doyle v. City of Buffalo*, 2006 WL 2560837 (N.Y. Sup. Ct. May 22, 2006), for example, a court awarded the plaintiff $1,636,000 (equivalent to approximately $2.5 million in 2023 dollars) for her pain and suffering when, as a result of the exercise of excessive force by police officers against her, plaintiff suffered injuries to her neck and wrist which left her permanently disabled and caused her to

---

[6] A number of cases cited by Plaintiff contain insufficient detail to be useful to the Court as guideposts.  While the plaintiffs in *Dorsey v. Reider*, *Genella v. Fornet*, and *Hess v. Norfolk & Western R.R. Co*. suffered similar injuries to Torres, the cited verdict summaries are devoid of information regarding the long-term effects of the injuries on those plaintiffs and the effect of the injuries on their employment status.  *See Genella v. Fornet Limousine Service Inc.*, 2010 WL 5664028 (N.J. Super. Ct. Law Div. Dec. 7, 2010); *Dorsey v. Reider,* 2009 WL 3388179 (Fla. Cir. Ct. Aug. 26, 2009); *Hess v. Norfolk & Western R.R. Co*., 1987 WL 863661 (Mo. Cir. Ct. June 7, 1987).  Further, the $1,500,000 million award in *Genella*, the $788,000 award in *Hess*, and the $1,500,000 awarded in a third case Plaintiff cites, *Bosier v. Union Pacific Railroad Company*, 2006 WL 1891818 (Tex. Dist. 103rd Judicial District, April 11, 2006), are not delineated by category of damages.  It is therefore not clear whether the awards address past or future pain and suffering, lost wages, medical expenses, or something else.

develop post-traumatic stress disorder ("PTSD").  In *Bachir v. Transoceanic Cable Ship Co.*,
2002 WL 413918, at *1, 7–8 (S.D.N.Y. Mar. 15, 2002), plaintiff was awarded $1,250,000
(equivalent to $2.15 million in 2023 dollars) for past and future pain and suffering, but he
suffered a contusion and sprain of the lumbar and sacroiliac spine, bursitis of the right hip, right
plantar fasciitis, left intercostal myocitis, and PTSD.  While the plaintiffs in *Doyle*, *Ahlf*
($1,750,000 for past and future pain and suffering in 2005 dollars and approximately
$2.8 million in current dollars), *Pace v. Nat'l Railroad Passenger Corp.* (approximately $1.2
million in 2003 dollars for future pain, suffering, mental anguish and loss of enjoyment of life's
activities and approximately $2 million in current dollars), and *Mickens v. Misdom* ($2,400,000
in 2015 dollars and approximately $3.1 million in current dollars), all either underwent surgery
(or would have undergone surgery, in the case of *Doyle*) to address their spinal injuries, which
undoubtedly would have caused pain in and of itself, Torres did not undergo surgery.  *See Doyle*,
2006 WL 2560837, at *1; *Ahlf v. CSX Transp., Inc.*, 386 F. Supp. 2d 83, 86 (N.D.N.Y. 2005);
*Pace v. Nat'l Railroad Passenger Corp*, 291 F. Supp. 2d 93, 97 (D. Conn. 2003); *Mickens v.
Misdom*, 105 A.3d 1163, 1165 (N.J. Super. Ct. App. Div. 2015).  Other facts also distinguish
those cases.  Plaintiff Pace "credibly" testified to his "constant" pain that was sometimes so
excruciating it required hospitalization.  *Pace*, 291 F. Supp. 2d at 104.  Plaintiff Mickens, who,
unlike Torres, was forced to return to work because he could not take any additional time off,
suffered pain so severe even after surgery that he "c[ould] do very little except rest on evenings
and weekends so he c[ould] try to keep working to support his wife."  *Mickens*, 105 A.3d at
1165.  And in *Ahlf*, *Pace*, and *Frazier v. Norfolk & Western Ry. Co.*, the plaintiffs were
prevented from returning to their former occupations as a result of their injuries.  *See Ahlf*, 386 F.
Supp. at 86–87; *Pace*, 291 F. Supp. 2d at 103; *Frazier v. Norfolk & Western Ry. Co*, 996 F.2d

922 (7th Cir. 1993) (damages award for past and future pain and suffering of $1.87 million in 1993 dollars and approximately $4 million in current dollars, *see* Dkt. No. 77-1). Plaintiff here was not. Plaintiff Ahlf initially returned to work on light duty with limited four-hour shifts but "significant aggravation and pain" forced Ahlf to leave his job. *Id.* at 86–87, 90. Plaintiff Pace was forced to leave his employer after he was unable to find an Amtrak role in Connecticut that accommodated his post-accident physical limitations. *Pace*, 291 F. Supp. 2d at 103–04. Pace testified to how being unable to return to his former occupation amounted to a personal loss. *Id.* at 104. Plaintiff Frazier's injury prevented that plaintiff from lifting more than fifty pounds and thus from returning to his job as a carman. *Frazier*, 996 F.2d at 925–26. At trial, a vocational expert testified that Frazier would have difficulty finding and keeping a job. *Id.* at 925.

In addition, while Torres testified to the impact of his injuries on certain of his favorite activities including dancing and bike riding, the injuries suffered by the plaintiffs in many of the cases cited by Plaintiff had greater impacts on their day-to-day lives. The plaintiff in *Pace* testified to how his injury affected his "involvement with and relationship with his children, because of the restriction on the amount of physical activity of which he is capable." 291 F. Supp. 2d at 104. And, as noted, the plaintiff in *Mickens* could do "very little except rest on evenings and weekends." 105 A.3d at 1165.

The cases cited by Defendant provide more useful guideposts. In each of these cases, certain factors may justify a greater award than the award here, while other factors weigh in favor of a lesser award. In *Rivera v. United States*, 905 F. Supp. 2d 564 (S.D.N.Y. 2012), the district court awarded a plaintiff whose car was struck by a United States Postal Service tractor $250,000 (or approximately $335,000 in current dollars) for past and future pain when the plaintiff suffered chronic neck and back pain and a limited cervical range of motion as a result of

the accident.  The plaintiff in that case had to undergo intrusive and potentially risky cervical

spine surgery and testified to having to cut back drastically in her work efforts and to the fact that

she could no longer engage in physical activities that had typified her earlier lifestyle.  *Id.* at 569.

In *Porcano v. Lehman*, 680 N.Y.S.2d 590, 592 (2d Dep't 1998), the Second Department remitted

an award of $650,000 to $175,000 (equivalent to approximately $329,000 when adjusted for

inflation) where the plaintiff (who also had to undergo surgery) suffered disc herniation in his

cervical spine; carpal tunnel syndrome; pain in his arms, hands, lower back, shoulders, and neck;

and extreme depression.[7]  In *Adams v. Romero*, 642 N.Y.S.2d 673, 674 (1st Dep't 1996), the

First Department held that a $750,000 award (equivalent to about $1.5 million in 2023 dollars)

for past and future pain and suffering for two herniated discs, hypertrophic posterior spurs, neck

pain, and limited neck mobility was excessive.[8]  In *Davis v. Yisrael*, 2019 WL 2098151, at *2, 4

(S.D.N.Y. May 14, 2019), the court awarded the plaintiff (who, unlike Plaintiff here, was only

thirty-two at the time of the accident) $350,000 for past and future pain and suffering where the

plaintiff, even after undergoing two surgeries, was expected to experience some pain and

discomfort for the foreseeable future and would not be able to participate in or perform certain

activities that he once could.

*Ventarola v. Navarez*, 2021 WL 1536540 (S.D.N.Y. Feb. 16, 2021), *report and

recommendation adopted*, 2021 WL 839454 (S.D.N.Y. Mar. 5, 2021), *Lane v. United States*,

1997 WL 47789 (S.D.N.Y. Feb. 6, 1997), and *Rountree v. Manhattan & Bronx Surface Transit

Operating Authority*, 692 N.Y.S.2d 13, (1st Dep't 1999), are perhaps the closest comparable

cases cited by either party.  In *Ventarola*, the court awarded the plaintiff, who suffered from

---

[7] Defense counsel mistakenly cites this case at "Porcaro v. Lehman."  Dkt. No. 74-2 at 7.
[8] Defense counsel mistakenly cites this case as "Adams v. Romero."  Dkt. No. 74-2 at 8.

incurable Tinnitus causing chronic insomnia and requiring hearing aids, in addition to a spinal

injury, $200,000 (approximately $232,000 in 2023 dollars) for pain and suffering.  2021 WL

1536540 at *2, 8, 15.  The evidence in that case indicated that the plaintiff's injuries "affected his

ability to perform numerous activities of daily living, including carrying groceries, cleaning his

apartment and car, bending down, playing with his grandchildren, having sexual relations with

his fiancée, exercising, sleeping through the night, flying, walking, sitting, and standing."  *Id.* at

*8.  In *Lane v. United States*, Magistrate Judge Francis awarded Plaintiff Lane $200,000

(equivalent to approximately $382,000 in 2023 dollars) for a cervical spine injury that resulted in

limited neck motion, which limited Lane's ability to enjoy skiing, jogging, playing tennis, and

attending moving screening parties with the same frequency he was able to before the accident,

but did not prevent him from returning to work the day after the accident.  1997 WL 47789, at

*1–5.  In *Rountree*, the court found that an award of $450,000 (equivalent to approximately

$826,000 in 2023 dollars) for past pain and suffering and $300,000 for future pain and suffering

(equivalent to approximately $555,000, for a total of $1,381,000 in 2023 dollars) for herniated

cervical discs and limited range of motion "did not deviate materially from what is reasonable

compensation" when, as a result of an accident, the plaintiff was disabled for several months, lost

the ability to perform his former job, and had permanent pain and loss of mobility despite

surgery and extensive physical therapy.  *Rountree*, 692 N.Y.S.2d at 17.  Further, Rountree's

expert testified that Rountree would eventually develop traumatic arthritis from his injury.  *Id.* at

16.

       After examining the cases cited by the parties and comparing them to the facts of this

case, the Court finds a range of approximately $232,000 (the award in *Ventarola* in current

dollars) to approximately $1,381,000 (the award in *Rountree* in current dollars) relevant to

determining the reasonable range of awards in the present case.  *See Sinkov*, 419 F. App'x at 93

(The court's task is only to inquire whether the "verdict is within reasonable range." (quoting

*Ismail*, 899 F.2d at 187)).  That range does not necessarily define the outer limits of a verdict that

would not shock the conscience.  A jury need not award precisely the amount that a prior jury

has awarded for its award not to be deemed to be excessive or to shock the conscience.  The

description on a piece of paper of the facts of a case cannot fully convey what a jury may have

heard in a prior case and the impressions they may have formed.  Moreover, even if two cases

are on all fours, the subsequent jury is not constrained by what a prior jury determined to be

appropriate.  Put otherwise, a jury can determine that the loss of enjoyment of a particular feature

of life or the experience of a particular form of pain is appropriately compensated by a particular

dollar award without binding all future juries to measure the pain and suffering of the victim it is

considering in precisely the same manner.  An award that is "*clearly* outside the maximum limit

of a reasonable range" of awards in prior cases provides support for the conclusion that the

award is irrational or would constitute a denial of justice.  *See Ahlf*, 386 F. Supp. 2d at 87

(emphasis added) (quoting *Paper Corp. v. Schoeller Technical Papers, Inc.*, 807 F. Supp. 337,

350 (S.D.N.Y. 1992)).  In addition, none of the cases cited by Defendant address the question

presented in this case—they address the damages the Court would award or the New York

standard of whether the award deviated materially from reasonable compensation, not the

question whether the award returned by the jury shocks the conscience.  *See Stampf v. Long

Island R. Co.*, 761 F.3d 192, 207 (2d Cir. 2014) (noting that the federal standard is "more

deferential" to the jury).

　　At the same time, however, the cases provide evidence with respect to what past

factfinders on similar facts following the law have found to be reasonable compensation for the

imponderable of pain and suffering.  *See Sinkov*, 419 F. App'x at 93 ("In determining whether a compensatory award is so large as to shock the judicial conscience, we look to other awards in similar cases."); *DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Our determination of whether a compensatory damages award is excessive should not be conducted in a vacuum, but instead should include consideration of the amounts awarded in other, comparable cases." (cleaned up)).

The law has not established the degree by which an award may deviate from a prior reasonable award without being deemed to shock the conscience.  It is clear that it may deviate to some degree.  Based on all of the relevant factors, the Court concludes that an award of $2 million for past and future pain and suffering is the outer limit beyond which an award would be so far in excess of the high end of the range as to shock the conscience.  Awards greater than that amount would put this case in the range of those involving victims with severe injuries causing lengthy, debilitating, and excruciating pain resulting in major loss of the enjoyment of life. Because the jury, here, awarded Plaintiff an amount of damages for past and future pain and suffering that *clearly* falls outside of that maximum limit, $6 million dollars, the jury's award shocks the conscience and is excessive.

## III.   Remittitur Is Warranted

Once the court has determined that an award is excessive, it may order remittitur or order a new trial, including a new trial limited to damages.  *Tingley Sys., Inc.*, 49 F.3d at 96. "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  *Stampf*, 761 F.3d at 204 (quoting *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984)).  The Second Circuit has noted that remittitur is appropriate in at least two distinct kinds of cases:

(1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, . . . and (2) more generally, where the award is 'intrinsically excessive' in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Trademark Rsch. Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993) (quoting *Shu-Tao Lin*, 742 F.2d at 49). "Remittitur may also be warranted when defendants can demonstrate 'that the jury awarded specific amounts of damages that were not supported by the record.'" *Qiyuan Shi v. Gyamera*, 401 F. Supp. 3d 452, 464 (S.D.N.Y. 2018) (quoting *Tse v. UBS Fin. Servs., Inc.*, 568 F. Supp. 2d 274, 287 (S.D.N.Y. 2008) (Lynch, J.)); *see also Trademark Rsch. Corp.*, 995 F.2d at 337 ("If it could be demonstrated that the verdict included any of TRC's unsubstantiated damages claims, the award would be by definition excessive.").

With respect to awards that are intrinsically excessive, the court should apply "the least intrusive standard to calculate remittitur—granting remittitur 'only to the maximum amount that would be upheld by the district court as not excessive.'" *Emamian v. Rockefeller Univ.*, 823 F. App'x 40, 42 (2d Cir. 2020) (quoting *Earl v. Bouchard Transp. Co, Inc.*, 917 F.2d 1320, 1330 (2d Cir. 1990)). "According to that standard, a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive." *Earl*, 917 F.2d at 1330.

"Remittitur, however, is not appropriate in certain circumstances, and, instead, the trial judge should simply order a new trial on damages." *Frank Sloup & Crabs Unlimited, LLC v. Loeffler*, 745 F. Supp. 2d 115, 146 (E.D.N.Y. 2010). Specifically, a new trial may be required "where the size of a jury's verdict [is] so excessive as to be inherently indicative of passion or prejudice." *Id.* (cleaned up). "The cases in which the jury's award is seen to reflect prejudice, however, are generally limited to those in which the remittitur granted is totally out of proportion to the damages allowed by the district court." *Ramirez v. New York City Off-Track Betting*

28

*Corp.*, 112 F.3d 38, 41 (2d Cir. 1997).  Remittitur is also not appropriate "where prejudicial error of some type infected the jury's entire consideration of the damages issue."  *Loeffler*, 745 F. Supp. 2d at 146.

Here, the Court determines that remittitur, as opposed to a new trial, is appropriate with regard to the jury's award for lost wages.  As discussed, the jury's award of $250,000 in economic damages was not supported by the record, as any lost wages in excess of $78,100 was unduly speculative.  Accordingly, the Court shall remit the number of economic damages to $78,100.  *See Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015) (remitting award after concluding "our detailed assessment of the trial evidence bearing on damages convinces us that the jury's inclusion in its award of $900,000 for the lost developer's fee was impermissibly speculative"); *Olaechea v. City of New York*, 2022 WL 3211424, at *9 (S.D.N.Y. Aug. 9, 2022) ("[T]he jury's front pay award must be remitted in its entirety for a 'specific error'—namely, that it was 'impermissibly speculative.' (citation omitted)); *Exodus Partners, LLC v. Cooke*, 2007 WL 120053, at *13 (S.D.N.Y. Jan. 17, 2007) (Lynch, J.) ("A close analysis of the record, however, reveals that the jury awarded certain damages for the breach of contract without adequate support in the record.  The Court will therefore require a $240,000 remittitur, bringing the breach-of-contract award to $90,000.").

The Court shall also remit the amount of damages for pain and suffering to $2 million, which is the most generous award that the jury could have granted without shocking the conscience based on the testimony and evidence in front of it.  While the jury's award of $6 million is excessive, there is no evidence that a "prejudicial error of some type infected the jury's entire consideration of the damages issue."  *Loeffler*, 745 F. Supp. 2d at 146; *see Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, 2022 WL 17689836, at *11 (S.D.N.Y. Dec.

15, 2022) (ordering new trial without remittitur where "the jury's excessive damages award—and particularly its award of punitive damages—can only be explained by the unfair prejudice to the defendants from the hearsay offered by the plaintiff").  Nor is the award "so excessive as to be inherently indicative of passion or prejudice" so as to prelude remittitur.  *Loeffler*, 745 F. Supp. 2d at 14 (cleaned up); *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 201 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008) (remitting $2.5 million compensatory damages award to $600,000).  Accordingly, the Court determines that a new trial is not warranted on damages, unless Plaintiff chooses to reject the remittitur.  *Loeffler*, 745 F. Supp. 2d at 146.

The Court thus remits the economic damage award to $78,100 and non-economic damages award to $2 million.  If Plaintiff chooses to reject the remittitur, Plaintiff is entitled to a new trial on the issue of damages.

## CONCLUSION

The motion for a new trial, or, in the alternative, remittitur is GRANTED IN PART and DENIED IN PART.  Plaintiff has the choice between a new trial on damages and a reduced verdict in the amount of $2,078,100.  Plaintiff shall notify the Court within 21 days from the date of this Order whether Plaintiff accepts the reduced verdict or chooses a retrial on the issue of damages.

SO ORDERED.

Dated: July 12, 2023
New York, New York
_____
LEWIS J. LIMAN
United States District Judge

30